[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12415
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 4, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00073-CV-LGW-5

GLADYS C. THORNTON,

Plaintiff-Appellant,

versus

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(December 4, 2009)

Before BARKETT, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Gladys Thornton appeals a decision that affirmed the denial of her

application for disability insurance benefits and supplemental security income from the Social Security Administration. 42 U.S.C. §§ 405(g), 1383(c)(3). The administrative law judge decided that Thornton was ineligible for disability benefits because she failed to prove that she had a severe mental impairment that lasted twelve months and began on or before December 31, 1997. Because substantial evidence does not support that decision, we vacate the order affirming the denial of benefits and remand for further proceedings.

## I. BACKGROUND

Thornton testified and submitted evidence at two evidentiary hearings that, beginning in 1992, she had suffered from mental disorders that affected her ability to maintain gainful employment. Thornton testified that, in February of 1992, she resigned from her position as an aid to a guidance counselor because she had difficulty concentrating, dressing for work, completing chores, or "respond[ing] to things that were required of [her] anymore." Thornton tried copying documents as a teacher's aid, but she became confused and gave the materials to the wrong teachers, suffered from delusions and hallucinations, and had personality conflicts that affected her relationships with members of her family. After Thornton quit work, she became forgetful, avoided household chores, slept 16 hours a day, and avoided interaction with the public.

2

Medical records provided by Thornton's treating psychiatrist, Clarence Johnson, suggested that Thornton suffered from episodic mental instability from 1994 through 2001, even when medicated. Johnson noted that in 1994 Thornton had delusions that Johnson treated with two antianxiety medications, Zoloft and Tranxene, and an antidepressant, Pamelor. In May 1995, Thornton had panic attacks that subsided with the administration of Lithium Carbonate, an antimanic medication. In October 1995, Johnson opined that Thornton was not "emotionally able to handle" a major oral surgery. From January through June 1996, Johnson recorded that Thornton was stable and remained on medication for "chronic bipolar depression with psychotic features[,]" a panic disorder, and obsessive compulsive disorder. In December 1996, Johnson reduced Thornton's medications and noted that her condition was "the best [Johnson] had seen . . . in several years." Thornton remained generally stable throughout 1997, other than a panic attack in May 1997.

According to Johnson's notes, Thornton deteriorated in December 1997 when she reported paranoid ideations about her husband starting a fire and putting rats in their house. Johnson prescribed Zyprexa, an antipsychotic medication, for Thornton's ideations. Although Thornton improved in January 1998, her husband called Johnson in late February complaining that Thornton was "really getting a little out of control." Johnson opined that Thornton was coping with her bipolar

3

depression because she was "not as delusional as she ha[d] been in the past." In March 1998, Johnson noted that Thornton was "still somewhat flat," but she was "not nearly as depressed" and, for the next several months, Thornton had good insight and judgment. Thornton deteriorated again in August 1998 and had difficulty with her thoughts and ideas of reference. In September, Thornton had hallucinations, and Johnson continued to prescribe Lithium, Zoloft, Tranxene, Pamelor, and Zyprexa for Thornton. In November, Johnson opined that Thornton was "doing fair" because even though she was somewhat depressed, she did not appear to be psychotic.

Johnson recorded that Thornton's mental health followed a similar cycle from 1999 through 2001. In January 1999, Thornton had good mental status, insight, and judgment, but in February, she had obsessive thoughts. By June, Thornton still had some paranoia and difficulty with ideas of reference, but her insight and judgment were good. In May of 2000, Thornton's paranoia had worsened, but within a few days, she had improved.

In the fall of 2001, Thornton changed doctors and received treatment from Dr. Barbara Davanzo. In June 2003, Davanzo recorded in her medical notes that Thornton had mental problems stemming from her daughter's drug abuse. Thornton attempted suicide in 2004 and was admitted to the hospital for treatment.

4

In August 2004, Davanzo submitted in support of Thornton's application for Social Security benefits a statement that Thornton was unable to work because she had difficulty understanding, recalling, or performing short, simple instructions, making judgments necessary to complete tasks, interacting appropriately with coworkers and the public, and responding to pressure. Davanzo stated that, based on Thornton's unstable moods, psychosis, and paranoia, Thornton was unable to behave appropriately in the workplace. In 2006, Davanzo signed a letter on which she circled yes in response to a question about whether Thornton's limitations existed on or before December 31, 1997.

In 2003, two psychiatrists evaluated Thornton's medical records and concluded that the evidence was insufficient to find that Thornton was disabled. Clare Rubin stated, in her one-paragraph conclusion, "Although manic depressive disorder is one of the diagnoses in [Thornton's] [Medical Examination Records] . . . there [are] no [records] covering [patient's] treatment, functioning or meds." In the paragraph that followed, Shelby Bennett stated she had "reviewed" the records and "confirmed" Rubin's "assessment."

During an evaluation in April 2005, psychologist David Acker found that Thornton's mental problems had been disabling. Acker found that Thornton, when medicated, could complete simple tasks and interact with others, but she had

difficulty complying with work rules, dealing with the public, exercising judgment, and coping with stress. Acker also found that Thornton could relate predictably in social situations, but she could be unreliable and unstable emotionally. Acker opined that Thornton's mental problems would affect "most all work activities" and it would be difficult for Thornton to find employment to accommodate her "psychiatric challenges."

At a hearing in August 2005, a vocational expert gave his opinion about what work Thornton could perform. When told about Thornton's education and work experience, the expert opined that Thornton was qualified to perform "only one job" as "a teacher's aid." The expert also opined that Thornton could serve as a teacher's aid even if Thornton had to take "prescribed psychotropic medications, which are without side effect[s]." The expert's opinion changed when given a hypothetical that the person could not comply with simple or detailed instructions, make simple work-related decisions, interact with coworkers or the public, or respond appropriately to work pressures. Based on these limitations found by Acker, the expert affirmed that the "person would not be able to return to the job as a teacher's aid" and stated that the limitations would "rule out other jobs that exist in the national economy." In response to a hypothetical that the person was "[s]eriously limited in ability to follow work rules, deal with the public, use

6

judgment, deal with work stresses, behave in an emotionally stable manner, [or] demonstrate reliability," but could satisfactorily "relat[e] to coworkers, supervisors, function[] independently, maintain[] attention and concentration, simple job instructions, personal appearance, and [had] no abilities in complex or detailed jobs," the expert affirmed that the person could not return to a job as a teacher's aid and "probably [could] not" perform "work that exists in significant numbers in the national economy."

The administrative law judge ruled that Thornton was ineligible for disability insurance benefits. The judge considered Thornton's medical records and found that Thornton had proved "precious little, mentally" before December 1997 and Thornton "had no year long [durational] symptoms, or loss shown." In his analysis, the judge found relevant that Rubin did not have sufficient evidence to rate Thornton's level of disability. The administrative law judge also found relevant that the vocational expert had opined that Thornton "could do her prior work or any work on medications without side effects." The administrative law judge discounted Davanzo's opinion that Thornton was disabled by December 1997 on grounds that Davanzo had not been Thornton's treating psychiatrist and Davanzo had available, but failed to reference, any medical records that supported her opinion. The Appeals Council denied Thornton's request for review.

7

A magistrate judge recommended that the district court affirm the decision to deny benefits. The magistrate judge agreed with the decision to discount Davanzo's opinion "because it was conclusory and was not accompanied by objective medical evidence." The magistrate judge ruled that the administrative law judge was not required to use a medical advisor to determine the "onset date" of Thornton's mental illness because "there was adequate evidence . . . to determine" that Thornton "was not disabled for a continuous period of at least 12 months" that began before December 31, 1997. The magistrate judge also ruled that "[t]here was substantial evidence" to support the conclusion of the administrative law judge that Thornton's "only limitation prior to her last date insured was that she was prescribed psychotropic medications, which were without side effects." The magistrate judge found that "[t]he record [did] not contain evidence that [Thornton] suffered from an impairment sufficiently severe so as to prevent her from engaging in gainful activity for a continuous period of at least twelve months." The district court adopted the recommendation of the magistrate judge and entered a judgment in favor of the Commissioner.

## II. STANDARDS OF REVIEW

We review the findings of fact of the administrative law judge "'to determine if [they are] supported by substantial evidence.'" Crawford v. Comm'r

of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997)). Substantial evidence consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. We review de novo the legal conclusions of the administrative law judge, Lewis v. Barnhart, 285 F.3d 1329, 1330 (11th Cir. 2002), and we will remand if the judge applied incorrectly the law relevant to the claim of disability. See 42 U.S.C. § 405(g) ("[T]he court shall review only the question of conformity with such regulations and the validity of such regulations . . . .").

### III. DISCUSSION

Thornton challenges the decision of the administrative law judge. First, Thornton argues more weight should have been accorded to Dr. Davanzo's opinion that Thornton was disabled before December 1997. Second, Thornton argues that substantial evidence does not support a finding that she was not disabled on or before December 31, 1997. We address each issue in turn.

*A. The Administrative Law Judge Had Good Cause to Discount the Opinion of Dr. Davanzo.*

Thornton argues that the administrative law judge erred by discounting Davanzo's opinion, but we disagree. The opinion of a treating physician must be given substantial or considerable weight unless good cause is shown to discount that opinion. Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004). Good

9

cause exists to reject an opinion that is conclusory. Crawford, 363 F.3d at 1159.

Davanzo concluded that Thornton had been disabled by December 31, 1997, but

Davanzo cited no medical evidence to support her conclusion. See id. Substantial

evidence supports the decision to discount Davanzo's opinion.

*B. The District Court Applied An Incorrect Standard to Determine the Duration of Thornton's Impairment.*

To qualify for benefits from the Social Security Administration, Thornton

had to prove she was disabled. See 20 C.F.R. § 404.1512(a); Doughty v. Apfel,

245 F.3d 1274, 1278 (11th Cir. 2001). To qualify as disabled, Thornton had to

prove that she had an "inability to engage in any substantial gainful activity by

reason of any medically determinable . . . mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Her

impairment had to be severe and "significantly limit [her] physical or mental

ability to do basic work activities," 20 C.F.R. § 404.1521(a), such as

"[u]nderstanding, carrying out, and remembering simple instructions"; exercising

judgment; "[r]esponding appropriately to supervision, co-workers, and usual work

situations"; and "[d]ealing with changes in a routine work setting," 20 C.F.R. §

404.1521(b). The severity of Thornton's disability had to be "measured in terms of

its effect upon [her] ability to work, and not simply in terms of deviation from

10

purely medical standards of . . . normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

Although a disability is defined as a "continuous" impairment, the regulations governing mental disorders take into account that symptoms may vary in severity and in response to medication. See 20 C.F.R. pt. 404(P) app. 1, at §§ 12.00, 12.03, 12.04. The regulations acknowledge that the "level of functioning" by a claimant "may vary considerably over time" and "[p]roper evaluation of [the] impairment must take into account any variations in [that] level of . . . functioning," id. § 12.00(D)(2), including the effect of medication on "all functional limitations," id. § 12.00(G). The level of functioning is evaluated by reviewing medical documents and personal chronicles of symptoms, id. § 12.00(B), and can be "inferred from medical records showing significant alteration in medication," id. § 12.00(C)(4).

Psychotic and affective disorders like those recorded in Thornton's case are considered disabling when "[m]edically documented" evidence establishes the claimant suffers "either continuous or intermittent" symptoms of her particular illness or "[r]epeated episodes of decompensation, each of extended duration." Id. §§ 12.03(A), 12.03(C), 12.04(A), 12.04(C). To constitute repeated episodes of extended duration, a claimant must prove that she has suffered "three episodes

11

within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Id. § 12.00(C)(4). The disorder may be considered severe even if symptoms are "currently attenuated by medication or psychosocial support." Id. §§ 12.03(C), 12.04(C).

In the light of these regulations, the administrative law judge erred in rejecting Thornton's claim of disability on the ground she failed to meet the "continuous" duration requirement. Thornton had to prove that she had a disability that began on or before the last date for which she was insured, which was December 31, 1997. See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 42 U.S.C. § 423(a)(1)(A)). Thornton testified that she began in 1992 to suffer symptoms consistent with disorders diagnosed by her treating physician, Johnson. In his medical notes spanning from 1994 to 2001, Johnson recorded Thornton's episodes with at least three mental disorders and the use of medication to attempt to regulate the symptoms of those disorders. On December 16, 1997, while Thornton was still covered for disability benefits, Johnson recorded that Thornton was "definitely in psychosis." Two months later, Thornton's husband reported that she was out of control and, during the following year, Johnson recorded that Thornton exhibited at times a flat affect, difficulty with her ideas of reference, hallucinations, and delusions. Although the administrative law judge

12

recites much of Thornton's medical history, the judge failed to consider whether Thornton's repeated episodes might qualify as an impairment sufficiently severe to constitute a disability.

The administrative law judge also erred by basing his decision on Rubin's inconclusive opinion. Rubin found that the evidence was insufficient to find Thornton disabled because "there [were] no [records] covering [patient's] treatment, functioning or meds." Rubin's opinion might have been different had she reviewed those records. The burden rests with the administrative law judge "to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(d)).

Substantial evidence did not support the finding of the district court that Thornton could perform her past work if medicated properly. Although the vocational expert testified that Thornton could work as a teacher's aid if she took psychotropic medication, the expert also testified that Thorton could not work if she suffered the functional limitations recorded by Acker. Acker's findings are supported by Johnson's medical records, which establish that Thornton manifested symptoms of her mental disorders, even when medicated.

We vacate the order of the district court and remand with directions to remand to the administrative law judge. On remand, the administrative law judge

13

must determine whether Thornton suffered, as a result of her mental disorders, "either continuous or intermittent" symptoms or "[r]epeated episodes of decompensation, each of extended duration." Id. §§ 12.03(A), 12.03(C), 12.04(A), 12.04(C).

## IV. CONCLUSION

We **VACATE** the opinion of the district court that affirmed the decision of the administrative law judge, and we **REMAND** for further proceedings.

14